Ms. Lopez, good morning. We understand you're splitting your time with your co-counsel here this morning, and we'll just ask you to keep an eye on the clock so that we can hear from both of you. Welcome. Sure thing. Good morning, Your Honors. May it please the Court, my name is Tanya Lopez, and together with my co-counsels Chloe Sibaranik and Evangeline Abreu, we represent the petitioner in this matter, Mr. Jimmy Sudney. Today I will be addressing Mr. Sudney's criminal conviction under the Arizona Revised Statute Sections 13-1203 and 13-1204 and argue that the IJ and BIA erred in their determination that his record of conviction identifies a deportable crime. My co-counsel Chloe will then address Mr. Sudney's credibility determination, corroboration issue, and eligibility for relief. My argument will take up seven minutes of our time. My co-counsels will take up six minutes. At this point, we would also like to reserve two minutes at the end for rebuttal. Your Honors, Mr. Sudney's record of conviction does not establish by clear and unequivocal evidence that he was convicted of a deportable crime. The IJ and BIA's determination that this was established is reversible for two main reasons. First, the IJ and BIA improperly engaged in a fact-based analysis to determine that Mr. Sudney pled guilty to a deportable crime. And second, the IJ and BIA's improper application of the factual basis statement rewrote his plea agreement, a direct violation of the Supreme Court's decision in Decomps v. United States. The relevant documents that make up Mr. Sudney's record of conviction are the plea agreement reflected on page 288 of the record, the court's order accepting the plea agreement on page 286 of the record, and the judgment on page 282 of the record, none of which state the specific subsections that Mr. Sudney pled guilty to. Rather, all of these documents show that Mr. Sudney pled guilty to counts 1 and 2 as amended. While the government argues that the complaint and indictment are judicially noticeable documents, which demonstrates that Mr. Sudney pled guilty to a deportable crime, their argument requires this Court to infer what changes were made by Mr. Sudney's plea agreement. As this Court held in Alvarado v. Holder, the charging instrument may not be considered where the individual pleads guilty to an offense different than that asserted in the indictment. Isn't this, or at least how do you respond to the counterargument that this is a little different than those cases because those cases involved a charge that had been dismissed, whereas this one had a charge that had been amended, and the amendment seems pretty clear that what it was doing was taking out this enhancement, the dangerous weapon enhancement, the sentencing enhancement. Correct. So, Your Honor, that is not specifically stated. Here, it still requires the Court to infer what changes were made by Mr. Sudney's plea agreement, and that is still a direct violation under Alvarado v. Holder because Mr. Sudney is not pleading directly to the complaint as it was filed. He's pleading to counts that are amended, and since it is not stated exactly what was amended, it requires this Court to infer what was made, and that was the ultimate holding of Alvarado v. Holder. Having established the relevant documents reviewable for the modified categorical approach, the IJ and BIA improperly engaged in a fact-based analysis to determine that Mr. Sudney pled guilty to subsection A-2 of ARS 13-1203 and 13-1204. Relying solely on the factual basis statement provided by Mr. Sudney's defense counsel on page 276 of the record, Mr. Sudney's defense counsel states that Mr. Sudney knowingly displayed a firearm, which is not an identical match to subsection A-2 of either statutes. Nowhere in section 1204 is there language that a defendant must knowingly display a firearm. Rather, this is a description of the facts underlying the conduct, similar to what was done in Marcia Costa, where defense counsel at that plea hearing stated that the defendant grabbed a metal bar. Likewise, in another decision of this Court, Sagun Gallegos, the defense counsel at that plea hearing described the defendant's conduct as pointing a gun. Here, Mr. Sudney's defense counsel described the altercation that occurred as knowingly displayed a firearm. The very fact that the Court has to substitute the words display for use to make a determination that Mr. Sudney pled guilty to a deportable crime is the prohibited analysis that was upheld in both Marcia Costa and Sagun Gallegos. How do you respond to the point that when you look at the rest of the colloquy in the statement, there is language in there that does almost verbatim track the 1203 A-2, and I understand the point you're making about some of the other language that's not as precise, but when you combine that with the charging documents and then the plea agreement, we have a pretty good picture of what he was pleading guilty to and, therefore, what he was convicted of. Well, Your Honor, as I stated, the indictment and the complaint are not reliable documents in this course because the plea agreement amended those, and so he's pleading to Counts 1 and 2 as amended, and it's not proper for a court to infer what changes were made by the plea agreement. Such a highly technical argument. There's really no doubt what happened here, Counsel. You're asking us to put on blinders. We don't like to put blinders on. You know, it's one thing if their charges were dismissed, but if it's just the same thing that happened in a previous case, the plea colloquy, the dangerousness part was removed but pled to the rest of the information. Your Honor, that still requires this court to change what is written on the plea agreement, to change what is written on the judgment, to change what is written on the order accepting Mr. Sudney's plea agreement because those dangerousness and those subsections, that language is not included in all three of those documents. What do you think he pled guilty to? I think he pled guilty to Counts 1 and 2 as amended, as is stated in his plea agreement. And what do you think the amendment was? I cannot infer what the amendments were, Your Honor, because it's not stated and it's not proper for this court to make such inferences. That was the holding in Alvarado v. Holder. Additionally, on page 3 of the record, the BIA's holding rests on the immigration judge's factual findings that Mr. Sudney was convicted for displaying a firearm. This is problematic because the IJ is engaging in the exact fact-based analysis that was held to be improper in Marcia Costa and Saagun Gallegos. Because displaying a firearm is not found in Section 1204, the IJ made a factual determination that the language in the plea colloquy was a match to a deportable crime, a crime involving moral turpitude. And furthermore, relying on this language is problematic because it adds an intentional mens rea element to Subsection A2 that is not stated in the statute. This is problematic because the IJ and BIA rely on these facts to determine that he pled guilty to a crime involving moral turpitude. Doesn't A2 have the mens rea of intention? Your Honor, Subsection A2 of ARS 1204 just states uses a deadly weapon. It does not include any type of mens rea element, and that's why it is also improper for this court, for the BIA and the IJ, to rely on that information. Right, but 1203A2 does have the intentionally mens rea language, and you have a simple assault plus an aggravating factor that together is essentially an aggravated assault. And it seems that the documents we can consider under the modified categorical approach do point to a violation of 1203A2 and 1204A2. Well, Your Honor, the modified categorical approach does allow for the court to look at the plea colloquy. However, DECOMS modified the manner in which plea colloquies may be used, and this court again upheld and recognized that decision in DECOMS in Marcia Costa. And although the language in the plea colloquy shows that Mr. Sudney pled guilty to 1203A2, it is simple assault. It's a general intent crime which has no elevated mens rea to that. At this point, I would like to pass it on to my co-counsel, Chloe. Good morning. Good morning, Your Honors. May it please the Court. Today, my name is Chloe Sobernik. Today I will argue three points. First, the IJ and BIA erred regarding Mr. Sudney's credibility. Second, the BIA erred in affirming that Mr. Sudney's claim lacked corroboration. Third, the BIA failed to consider the persecution Mr. Sudney faced due to his political opinion and membership in particular social groups. All of this amounted to his torture of beatings, acid thrown at his eyes, gunshot on stabbing wounds, and death threats. This allows him asylum, withholding of removal, and relief under the Convention Against Torture. Your Honors, turning to my first point, none of the four bases for the adverse credibility findings are supported by substantial evidence. First, the IJ and BIA erred in finding Mr. Sudney non-credible because he did not mention his membership in the Lava Lost Party until cross-examination. Mr. Sudney believed his persecution was because of his Neighborhood Watch Party actions. He also states that he has helped his cousin Jean Sudney, who was a member of the Haitian Counter-Ambush Team, and as a part of the Neighborhood Watch Party, he would detain alleged criminals until the police would come and arrest them. The harm did not arise directly from the Lava Lost Party, but arose instead because of his actions with the Neighborhood Watch Party and helping his cousin, who was a high member of the Haitian Counter-Ambush Team. On record pages 128 and 129, you can see that DHS pulls out of Mr. Sudney what political party he belonged in. Second, Your Honors, the IJ and BIA erred in finding inconsistencies between Mr. Sudney's testimony and his mother, Ms. Sudney's testimony, regarding his dead son. Mr. Sudney listed only his living child in the I-589 application, and even the IJ notes in his decision that Mr. Sudney became visibly shaken when speaking of his son's death. In record page 153, DHS asked Ms. Sudney, his mother, how many children he had, and she said, he have two children, and later said one here and one in Haiti, but was never asked whether both were living. For the IJ to make this a large basis on his adverse credibility finding, Ms. Sudney should have received a clarifying question, especially since she was not testifying in her native language. This can be seen in her usage of have, which is improper grammar and could mean past tense. Third, the BIA erred in finding Mr. Sudney's response regarding his medical records implausible. The error here is that they didn't take his response in its entirety. On record page 143, Mr. Sudney's response of, we don't have that, was taken to mean that Haiti does not have medical records, but failed to take into consideration Mr. Sudney being cut off and saying right after, I wish I had someone to contact in Haiti to obtain those medical records for me. Fourth, the BIA erred in holding that there is a discrepancy between Mr. Sudney's at-court hearing statements and with a pre-sentence report, which they said had discrepancy with the criminal records. There are two errors here. First, there are many reasons why people plead guilty, as can be seen in the Supreme Court's decision in North Carolina v. Alford. Second, the IJ compares Mr. Sudney's under oath statements at the hearing with a pre-sentence report of people who were speaking not under oath with information recounted by a government employee. This document is not only hearsay, but fundamentally unfair because Mr. Sudney had no opportunity to cross-examine these individuals. And if you look at all those documents, there are no material discrepancies. Turning to my issue of corroboration, there are two errors here. First, the IJ can only ask for corroborating evidence if it is reasonably available. Mr. Sudney here testifies that he has no one in Haiti to contact to obtain these medical records for him. And second, the IJ says that the IJ never required Mr. Sudney to obtain such corroborating evidence to support his claim, which goes against this Court's holding in Wren. Lastly, Your Honors, Mr. Sudney is eligible for all forms of relief. Mr. Sudney has faced past persecution from having acid thrown at his eyes, from multiple beatings, from a nearly fatal gunshot, from death threats spray-painted on the house his family was just killed in. And then later when he left Haiti, his son was killed by arson. Mr. Sudney clearly has a well-founded fear and clear probability of persecution on account of two protected grounds, his political opinion and his membership in particular social groups. Today's focus will be on his family. His family has links all throughout the Haitian government. When he was a child, his grandmother was chief precinct, which caused him to be kidnapped at age seven. His cousin who was murdered was a part of the Haitian counter-ambush team. And Mr. Sudney himself was hired by the mayor to be a part of the neighborhood watch party. Your Honors, I see that my time is running up, so I will say in conclusion, Mr. Sudney respectfully asks this Court to grant his petition and reverse and remand to the BIA for a new decision. Thank you. Thank you very much. May it please the Court. My name is Jennifer Singer and I represent the United States Attorney General, the respondent in this matter. The central question or the two central questions in this case are whether Petitioner is removable for having been convicted of a CIMT, a crime involving moral turpitude, and whether the Board's adverse credibility finding is supported by substantial evidence. And the answers to those questions are yes. With regard to removability, it seems that Petitioner agrees that the statute, the aggravated assault statute under Arizona law is divisible and that the modified categorical approach applies. So I'm just going to jump right into the judicially noticeable documents. They did argue in their brief that it was not divisible, at least the 1204 portion of the statute. I don't know that they argued it this morning, but they certainly did in their brief. They didn't argue it this morning, and in their brief they did, but they did not exhaust that before the agency. And in fact, before the IJ and the Board, they seemed to agree that 1204A was, in fact, divisible because they just simply discussed the judicially noticeable documents. What's your response on the merits? To the divisibility? Yeah. Based on Mathis, if you look to two things, say that it's divisible and that the 1204A sets forth separate elements. First, under Mathis, it says that if a statute sets out alternatives and those alternatives are punishable separately by different grades of punishment, then that is elements, and that is what the statute is here. 1204A sets out 11 separate subsections, and each of those subsections are punishable by a different length of imprisonment. And then if you look to the way the state courts interpret the statute, they have held that 1204A are separate elements and lay out the crimes in the alternative and are not alternative means for committing the crime. And I point to this court to State v. Kelly, and in that case the Arizona State Court held that aggravated assaults, specifically under 1204A1 and 1204A2, are separate crimes that must be charged separately and that a jury needs to find unanimously on the aspect of whether there was either physical harm inflicted or whether the aggravated assault was committed with a deadly weapon or a dangerous instrument. So for those reasons, the statute is divisible and the modified categorical approach applies. And applying the modified categorical approach, looking to the judicially noticeable documents, which here is the indictment, the plea agreement, and the transcript of the plea colloquy. Petitioners argue that the court should not look to the indictment, the language of the indictment, which does track the language of 1204 and 1203A2, both of those subsections, because that and the plea agreement amended the indictment. But as this court got out earlier, courts that have stated that have cited to Alvarado and Vidal felt in support of the contention that a plea agreement that amends a charging document cannot be relied upon for modified categorical purposes. But if you really read those cases, those cases say that where the count is modified or dismissed and changed almost entirely to charge a separate offense, that is in a situation where you cannot rely on the language of the charging document. Here, if you look to the charging document and the plea agreement, it seems clear to me at least, and I would hope to this court as well, that the only change that was making to the indictment was that the government, in exchange for petitioners' plea of guilty, was that it was agreeing to remove both allegations of dangerousness. It was doing nothing, and the plea agreement doesn't indicate otherwise, that it was otherwise modifying the substantive charges under A1 and A2. So that aside, I think the court can look to the language of the indictment to show that petitioner pled guilty to A1 and A2. And in conjunction with that, we also have the transcript of the plea colloquy. And in the plea colloquy, the petitioner twice assented to his defense counsel's factual basis statement, and the factual basis statement says all the elements of the crime of A2, of 1203-A2 and 1204-A2, and totally tracks the language of the subsections. Petitioners make much of the fact that the word knowingly is included in that, the statement made by defense counsel, but that adjective descriptor is completely superfluous. It's not an element of the crime, and the agency didn't rely on that in finding that his crime... Did not use that language to find that he was convicted under A2 because A2 only requires intentional conduct, and that was the language the defense counsel used, and that's what petitioner twice assented to in the plea colloquy. In light of those documents, it seems clear that petitioner was convicted under Arizona aggravated assault subsections 1203-A2 and 1204-A2. Those subsections constitute a crime involving moral turpitude. The case law of this court makes clear that when we have an assault and then there's an aggravated element present and that there's a sufficient coupleable state of mind that a simple assault rises to the level of a crime involving moral turpitude. Here we have the aggravating factor, use of a deadly weapon or dangerous instrument, and we also have a heightened mental state, and that's intent here. Under the case law of the board in this court, those two factors transform a simple assault, which is generally not a CIMT, into an offense that is a crime involving moral turpitude. And for that reason, petitioner is removable. Now we'll turn to the issue of the adverse credibility finding. The board found petitioner not credible on four grounds, and the evidence in the record does not compel this court to conclude to the contrary. The first ground that the board relied on is... or one of the grounds that the petitioner relied on is the petitioner's testimony that he was a member of the Lovalis party and that he worked as a security detail for candidates for that party. That claim that those facts were not mentioned in his asylum application, they were not mentioned in a declaration that he submitted after the asylum application, this is not just an additional detail to petitioner's claim, this is essentially an entirely new claim. That omission from the asylum application and the declaration supports the immigration judge's adverse credibility finding. Petitioner's counsel argued that the court should give it no credence because that really wasn't the basis of his fear, that really the basis of his fear was his work as a member of the Neighborhood Watch, but petitioner was asked repeatedly why that information was not included in the asylum application, and he said initially that it was, which it wasn't, and he said that, oh, there's a lot of things that he thinks about that he didn't feel like writing down, and those were his explanations. The judge was not required to credit those. Which portion of the record are you referring to for that last part? That there's a lot of things that he thinks that he doesn't want to write down. That is... The comments you were making just a second or two before that, which I take it are probably all together in the same spot in the record. It's AR 131-32. He initially asked repeatedly why it wasn't the Lovalis Party membership and his work as the security detail for candidates were not included, and he said it was there, it was written on his declaration, he did say that, and then he goes on to say that there are a lot of things I have to say I don't like to, I don't want to write it down. And then a third time he was asked why the information was not included in the written application, and he responded that I don't have an answer for that. If that wasn't the basis of his fear or not a way to bolster his claim, then he could have said, oh, it wasn't in my application because that is not why I'm afraid. He didn't respond to that. That is an omission, and the immigration judge and board were entitled to rely on that in making their adverse credibility finding. Another ground was Petitioner's inconsistent testimony regarding the circumstances of his conviction. Petitioner twice said that during the testimony before the immigration judge that he didn't flee the scene and that he didn't flee the scene, he twice said that. But looking to the police report, he admits to police officers that he did in fact flee the scene of the crime, that he crashed his car, and that he hid in the bushes while the police were investigating the aggravated assault, and that he did so because he was drunk and he was scared. Those statements weren't made under oath, but that doesn't matter because for adverse credibility finding, the immigration judge is entitled to rely on inconsistencies whenever a statement is made, wherever a statement is made, and whether or not that statement is made under oath. That is an inconsistent statement, and the board and the immigration judge were permitted to rely on that. Again, the agency also relied on the fact that before the immigration judge, Petitioner twice, I believe, said that he did not intend for his victims to be placed in reasonable apprehension of fear. Yet he pled guilty to that, and it's a permissible basis for the judge to rely on that because we cannot, on the one hand, hold into those statements for a plea guilt, and then not hold into the same statement for purposes of adverse credibility. The immigration judge also relied on the fact that Petitioner was not able to corroborate his claims of being shot and stabbed. Petitioner claimed he was shot and almost died because of that shooting, and that he received a blood transfusion. He also claimed that he was stabbed. And those two incidents happened on separate occasions, and for each of those instances, he received medical treatment. Yet he could not provide any documentation for that. His initial response was that, in Haiti, or, we don't have that in Haiti. When asked to clarify, he said, rather, I don't have anyone or I don't have anyone's contact information to be able to obtain those records. Those two responses to that question are inconsistent and further, you know, raise issues of credibility, and the immigration judge was entitled to rely on that. As to the final basis for the agency's adverse credibility determination was the testimony regarding the Petitioner's child. Arguably, that is a weaker finding as there's explanations for translation errors, language errors, and I would say that potentially it is an arguably weaker basis. But I would just note two things on that. Immediately following Petitioner's mother's testimony regarding the children, one in the United States, one in Haiti, the immigration judge asked Petitioner if he wanted to question his mother. Petitioner declined to do so. He had the opportunity, immediately following that testimony, to clarify, and he did not take that opportunity to do that. And I would also note that even if one of the grounds is a weaker ground for the adverse credibility determination, the remaining grounds are sufficient to sustain the adverse credibility determination. I think it's a tube case where this Court has held that even one omission is sufficient to sustain an adverse credibility determination. And because Petitioner is removable and... Oh, I would also note that Petitioner's counsel argues the merits of Petitioner's asylum claim, but this Court should not consider the merits because the Board did not address that as that was unnecessary to the Board's overall decision. Because of the adverse credibility finding? Because of the adverse credibility finding, it makes Petitioner ineligible for asylum and withholding. And the Board also found that Petitioner waived his CAT claim before it for not raising it, so that is also off the table. So the Court should affirm the agency's finding of removability and also affirm the agency adverse credibility finding and deny the petition for review. Thank you. Thank you. Your Honors, I will be splitting my rebuttal time one minute between myself and my co-counsel. On rebuttal, I would like to make three quick points. First, I would like to emphasize that the factual basis statement is the only indication of what Mr. Sedney pled guilty to and is not reliable due to the fact that the Court must engage in this prohibited fact-based analysis stated in Marcia Costa. Second, the indictment is not reviewable because the plea agreement amended the indictment and because the three documents, the plea agreement, the order of the Court, and the judgment do not state what the amendments were to the charging documents, and that still requires this Court to infer what changes were made, which is not proper. And third, simply because a defendant assents to a factual basis statement does not make it reliable, as the Supreme Court stated in Descamps and Padilla v. Kentucky, that defendants are left at the mercies of their defense counsels and may have very good reason not to contest what is stated at these plea hearings. I now turn it over to my co-counsel. Your Honor, I think the biggest point here regarding Mr. Sedney's credibility finding is that he was pro se at the time, and English is not his first language. Going point by point on the four bases for his Lava Lost Party political body work, that was 2011 and a short-term temporary work. As for his Neighborhood Watch Party work, it was from 2008 to 2012. So for Mr. Sedney, most of his persecution all throughout his life has been because of his Neighborhood Watch Party work. And in regards to his convictions, although it is a hearsay document, the IJ has to make sure it is fundamentally fair, especially since Mr. Sedney was pro se at the time, and English is not his first language. Mr. Sedney was materially consistent all the time with what he said at the pre-sentence report and what he stated at the hearing. In regards to the Alford plea, Mr. Sedney pled guilty because he wanted to be there at the birth of his child, and that should be taken into account. And during corroboration, he did not know anyone. He was in the middle of a statement. And because of the 2010 earthquake, it could be seen that it could be harder for Mr. Sedney to get. And he most importantly was pro se. Thank you. Thank you. I want to echo the comments of Judge Wallace and thank you for your participation in our pro bono program. We greatly appreciate that. For those of you in the audience who don't know what happened here today, these people are not yet lawyers. They have a few more steps to take before they get there. But some years ago, while I had responsibility for the court, we decided that we needed more help for cases that were coming without representation. It's huge numbers that come in without lawyers, and it's like searching for a needle in a haystack. But we have competent attorneys that look over every pro se case, and if they come up with one that they believe that we need to have more done with it, I was looking at it for our discussion. We have a rule that allows law schools to bring these students forward if they have a professor that's admitted to the bar and is willing to take the responsibility. And that's what you heard today. Very fine arguments. And it's because we needed some help. And, of course, they get the opportunity to come here and become a lawyer for a day. But it's really of great help to us, and we appreciate the law school and their efforts to assist us. We not only have people such as we heard today, but many lawyers volunteer to take pro bono cases when the court believes that we need representation on both sides. So that's what we wanted to let you know. We ordinarily just thank them, but you should know that they're providing a great service that we need so that we can properly administer the law, and thank you very much. Thank you, Judge Wallace. Nicely argued on both sides. The case is submitted, and we are adjourned. All rise.
judges: Wallace, Bress, Lasnik